REDACTED

  

~~UNDER SEAL~~ IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | UNDER SEAL |
| | ) | |
| v. | ) | CRIMINAL NO.: 1:11 mj 742 |
| | ) | |
| JUBAIR AHMAD, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT, ARREST WARRANT, AND SEARCH WARRANT

I, Daudshah S. Andish, being duly sworn, depose and state:

## I. INTRODUCTION

1. I am a Special Agent of the Federal Bureau of Investigation. I have served as a Special Agent since 2008, and I am currently assigned to a counterterrorism squad at the Washington Field Office. Through my training and experience, I am familiar with the federal criminal offenses involving international terrorism.

2. This affidavit is submitted in support of a criminal complaint charging JUBAIR AHMAD (hereafter "JUBAIR") with providing material support to a designated foreign terrorist organization ("Lashkar-e-Tayyiba"), in violation of 18 U.S.C. § 2339B, and making material false statements, in violation of 18 U.S.C. § 1001(a)(2), in a matter involving international terrorism as defined in 18 U.S.C. § 2331. This affidavit is also submitted in support of a warrant to search JUBAIR's residence, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ in Prince William County within the Eastern District of Virginia, as described in Attachment A.

REDACTED

3. This affidavit is based on my personal knowledge, information conveyed to me by other law enforcement officers, my review of communications obtained through court-authorized electronic surveillance, and my examination of documents and records obtained during the course of this investigation.

## II. GENERAL BACKGROUND

### Designation of Lashkar-e-Tayyiba as Foreign Terrorist Organization

4. In or about 1990, Hafiz Mohammed Saeed and others founded an organization in Pakistan called Lashkar-e-Tayyiba ("Army of the Pure") that serves as the military arm of the political movement Markaz al-Dawa wal-Irshad. The mission of Lashkar-e-Tayyiba (hereafter "LeT") is to conduct and promote violent jihad against those they consider to be the enemies of Islam. The focus of LeT terrorist operations has been attacks on the neighboring country of India, in particular the disputed Kashmir region between Pakistan and India.

5. On or about December 24, 2001, the U.S. Department of State designated LeT as a foreign terrorist organization after determining that LeT had committed, or posed a significant risk of committing, acts of terrorism that threaten the security of U.S. nationals or the national security, foreign policy, or economy of the United States.

6. After the U.S. State Department designated LeT a foreign terrorist organization, LeT changed its name to Jamaat-ud-Dawa (JUD). On or about April 27, 2006, the State Department re-designated LeT as a foreign terrorist organization, which included the alias Jamaat-ud-Dawa (JUD). LeT then changed its name to Falah-i-Insaniat Foundation (FIF). On or about November 24, 2010, the U.S. Department of State re-designated LeT as a foreign terrorist organization, which included the alias Falah-i-Insaniat Foundation (FIF).

Profile of JUBAIR AHMAD

7. A review of immigration records indicates that JUBAIR was born on ▓▓▓▓▓▓▓, in Sialkot, Pakistan, and resided in Pakistan until the age of nineteen. According to admissions JUBAIR made during a number of communications analyzed by the FBI, JUBAIR received indoctrination and training from LeT while he lived in Pakistan.

8. These communications demonstrate that, as a teenager, in or about 2004, JUBAIR attended an LeT training course known as Dora Suffa where he received instruction in religious dogma and proselytizing. Next, he attended LeT's basic training camp known as Dora A'ama, where he received additional religious indoctrination, physical conditioning, and weapons instruction. For example, when describing his training at Dora A'ama, JUBAIR stated in one of the communications that recruits "listen to lectures, offer your prayers, exercise, study guns, fire them" and added "where I got training from they do the commando training there now." Subsequent to attending Dora A'ama, JUBAIR reported for the next stage of LeT training – the commando course known as Dora Khasa. He spent only a week at that course, however, because an instructor at the training camp told JUBAIR that he was too young, that he needed to continue his studies, and then he could return to complete Dora Khasa.

9. On or about October 19, 2006, the U.S. Department of State issued JUBAIR a visa based on the fact that JUBAIR's father was related to a U.S. citizen. On or about February 19, 2007, JUBAIR entered the United States with his father, mother, and two younger brothers. His current immigration status is Lawful Permanent Resident. JUBAIR has resided with his family in an apartment in Woodbridge, Virginia. The address of the apartment is ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

## III. FACTS THAT ESTABLISH PROBABLE CAUSE

10. In 2009, after receiving information that JUBAIR may be associated with LeT, the FBI commenced an international terrorism investigation of JUBAIR. This investigation revealed that JUBAIR provided material support to LeT by producing and posting an LeT propaganda video glorifying violent jihad. Based on my training and experience, I know that terrorist organizations such as LeT, and movements affiliated with them, use the Internet and other media as part of well orchestrated propaganda campaigns. These campaigns seek to recruit individuals to participate in violent jihad and to promote the spread of terror.

Posting the LeT Video

11. Google records confirm that at 3:59 p.m. on September 25, 2010, an LeT propaganda video was uploaded to the YouTube account ███████. Google records further indicate that the IP address associated with JUBAIR's residence ███████ accessed that YouTube account at the exact same time, which is consistent with the act of uploading the video.

12. During the course of my investigation, I accessed the ███████ channel on YouTube and viewed the video created and posted by JUBAIR. This video is approximately five minutes long and is a compilation of pictures and video clips spliced together, with a prayer dictated by the leader of LeT, Hafiz Saeed, audibly heard in the background. Although the prayer is not in English, the words "mujahideen" and "jihad" can be heard throughout. The video includes images of LeT leader Hafiz Saeed, so-called jihadi martyrs, and armored trucks exploding after having been hit by Improvised Explosive Devices (IEDs). At different points in the video, a number of terrorist logos can be seen, one of which is commonly used by LeT (which also shows the name "Lashkar-e-Tayyiba" under the logo). Another logo is known to be used by al-Qaeda in Iraq (AQI). Based on

my training and experience, it is evident that the video JUBAIR produced is designed as propaganda to develop support for LeT and to recruit jihadists to LeT.

13. On September 25, 2010, JUBAIR used the email account [REDACTED] to send a link to the video to another subject at a hotmail account. Subscriber information from Microsoft confirms that email account [REDACTED] is in the name Jubair Ahmad and the hotmail email account is in the true name of the other subject.

14. The next day, JUBAIR communicated with that subject and told her that Hafiz Saeed's son Talha Saeed spoke to him and that JUBAIR worked on a video all day. This communication is significant because it directly names LeT leader Hafiz Saeed and then identifies Talha Saeed as his son.

## Preparation of the LeT Video

15. On September 25, 2010, JUBAIR communicated with a person whom he addressed as Talha. Talha asked JUBAIR to include pictures of Hafiz when Hafiz was being arrested and placed under house arrest. As the conversation continued, Talha described types of photos to be used in the video. It is reasonable to conclude that the statements regarding Hafiz being placed under arrest are a reference to the widely publicized detentions of LeT leader Hafiz Saeed by Pakistani authorities. The LeT video uploaded by JUBAIR contains photos of Hafiz Saeed surrounded by uniformed officers, which demonstrates that JUBAIR followed Talha's instructions to use such photos in the video.

16. In another communication on September 25, 2010, JUBAIR communicated with Talha. Talha said there was a prayer by Hafiz on YouTube and they needed to tweak the voice of that audio to make it better. He described particular photos in great detail that JUBAIR should include in the

5

video. As described above, the LeT video uploaded by JUBAIR presents a series of images while a prayer by Hafiz Saeed is played in the background. This matches the concept of the video described by Talha.

17. During the same communication between JUBAIR and Talha, JUBAIR asked if he should post the Mumbai one and added that they want to show their power. Based on my knowledge of LeT terrorist operations, I believe this is a reference to LeT's ability to project their power as demonstrated by the attack in Mumbai, India, on November 26, 2008, which resulted in the death of over 160 people. Talha told JUBAIR not to use anything referencing Mumbai but said JUBAIR could reference Palestine and operations of mujahideen in Kashmir. Talha said JUBAIR could use several scenes like these and suggested that JUBAIR search for LeT on YouTube where he could find those scenes in jihadi songs. The discussion of LeT, Mumbai, mujahideen operations in Kashmir, and jihadi songs reflects that the purpose of the video is to promote LeT as a terrorist organization.

18. In early October 2010, after seeing the first video, Talha Saeed contacted JUBAIR and asked him to remove the words "Lashkar-e-Taiba" wherever they were written. Talha also asked JUBAIR not to show too many images of Kashmir, but instructed him to add images of the mujahedeen where the word "Jihad" is spoken in the prayer. Talha then played the video several times, giving JUBAIR editing instructions after each session. JUBAIR revised and uploaded this second version of the video on October 16, 2010.

19. The revised version of the video that JUBAIR produced is also a compilation of pictures and video clips spliced together with a prayer dictated by Hafiz Saeed audibly heard in the background. As the video progresses, there is a picture of a dead Middle Eastern man lying on the

sidewalk with blood under his chin, followed by a picture of a dead Middle Eastern man with a bullet hole in his neck. Four military soldiers are seen surrounding what appears to be three dead or injured individuals. Also shown is a detainee at the Abu Ghraib military detention facility in Iraq, wearing a hood and military poncho, standing on a box. The video also contains a picture of a naked Middle Eastern prisoner in a defensive position in front of American soldiers, one of whom is restraining an attack dog. The video depicts a number of Middle Eastern men performing military activities and carrying and firing assault rifles and rocket propelled grenades. As with the original version of the propaganda video, this video was intended to promote LeT and acts of international terrorism.

20. In early 2011, after receiving a court order authorizing a physical search of JUBAIR's residence, FBI agents recovered and examined digital media and audio files that appear to be the same ones used in the first video uploaded to the YouTube account. The files located on JUBAIR's media were created, modified, and accessed on September 25, 2010, the same date the first video was uploaded. The files were located in an external computer hard-drive in a folder titled: Allah Hu Akbar\Lectures\YouTube Upload\Hafiz Saeed Qunoot. Under this folder were a series of images ranging from photos of Hafiz Saeed to photos of terrorist martyrs that were the exact same images that appear on the YouTube video posted on September 25, 2010. When FBI agents interviewed JUBAIR on August 23 and 24, 2011, he confirmed that he had used the external drive to keep his religious references.

21. On August 23, 2011, during an interview of JUBAIR at a location in Loudoun County, Virginia, FBI agents showed him the video entitled "Qunoot E Nazila by Hafiz Muhammad Saeed. Very Emotional." that had been posted under the user name ▮▮▮▮▮ on YouTube on October 16, 2010. JUBAIR falsely denied any involvement with the YouTube video, stated this was the first

time he had seen the video, and explained that ▮▮▮▮ added him as a friend on YouTube. On August 29, 2011, FBI agents attempted to access this video on YouTube, and the video no longer existed. It is reasonable to conclude that JUBAIR, after having been confronted by the FBI about the YouTube video, deleted the video from ▮▮▮▮ channel on YouTube.

### IV. SEARCH OF JUBAIR's RESIDENCE

22. Based on my training and experience and that of my colleagues, I know that individuals engaged in activities in support of terrorist organizations usually have had prior contacts with other individuals affiliated with such organizations, often resulting in the generation of information and other evidence that relate to their plans, including travel documents, contact information, correspondence, financial records, and group affiliations, as described in more detail in Attachment B, which is incorporated herein.



24. In late 2010 and early 2011, FBI agents with whom I have worked on this investigation entered the subject premises as part of a court-authorized physical search, and verified that it was occupied by JUBAIR. They reported that, while they were there, they saw numerous pieces of

computer equipment, including both a desktop and laptop computer, thumb drives, and external hard drives. Also observed were notebooks, journals, and Islamic-related literature.

## V. FORENSIC ANALYSIS OF COMPUTER AND STORAGE DEVICES

25. As described above and in Attachment B, this application seeks permission to search and seize various records that might be found on any computers or computer devices in whatever form they are found. Some of these electronic records might take the form of files, documents, and other data that is user-generated. Some of these electronic records might take a form that becomes meaningful only upon forensic analysis.

26. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crime described on the warrant, but also for evidence that establishes how any computers were used, the purpose of such use, who used it, and when.

27. Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processor, picture, and movie files), computer storage media can contain other forms of electronic evidence as well.

   a. Forensic evidence of how computers were used, the purpose of their use, who used them, and when, is, as described further in Attachment B, called for by this warrant. Data on the storage medium not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration

information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

  b. Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, and correspondence (and the data associated with the foregoing, such as file creation and last accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

  c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

  d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance with particularity a description of the records to be sought, evidence of this type often is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application

of knowledge about how a computer behaves. Therefore, contextual information necessary to understand the evidence described in Attachment B also falls within the scope of the warrant.

    e.  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, I know from training and experience that it is possible that malicious software can be installed on a computer, often without the computer user's knowledge, that can allow the computer to be used by others, sometimes without the knowledge of the computer owner. Also, the presence or absence of counter-forensic programs (and associated data) that are designed to eliminate data may be relevant to establishing the user's intent. To investigate the crimes described in this warrant, it might be necessary to investigate whether any such malicious software is present, and, if so, whether the presence of that malicious software might explain the presence of other things found on the storage medium. I mention the possible existence of malicious software as a theoretical possibility, only; I will not know, until a forensic analysis is conducted, whether malicious software is present in this case.

28. Searching storage media for the evidence described in the Attachment may require a range of data analysis techniques. It is possible that the storage media located on the premises will contain files and information that are not called for by the warrant. In rare cases, when circumstances permit, it is possible to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence. For example, it is possible, though rare, for a storage medium to be organized in a way where the location of all things called for by the warrant are immediately apparent. In most cases, however, such techniques may not yield the evidence described in the

warrant. For example, information regarding user attribution or Internet use is located in various operating system log files that are not easily located or reviewed. As explained above, because the warrant calls for records of how a computer has been used, what it has been used for, and who has used it, it is exceedingly likely that it will be necessary to thoroughly search storage media to obtain evidence, including evidence that is not neatly organized into files or documents. Just as a search of a premises for physical objects requires searching the entire premises for those objects that are described by a warrant, a search of this premises for the things described in this warrant will likely require a search among the data stored in storage media for the things (including electronic data) called for by this warrant. Additionally, it is possible that files have been deleted or edited, but that remnants of older versions are in unallocated space or slack space. This, too, makes it exceedingly likely that in this case it will be necessary to use more thorough techniques.

29. The items seized as part of this application will have forensically sound images (digital copies) produced of the seized items, which will in turn be searched in lieu of the original seized items as part of a digital media/computer forensic examination. The search of digital copies of the items seized is done to ensure and preserve the forensic integrity of the seized items for additional and/or future examination(s) in accordance with criminal procedure and rules of evidence. These examination(s) of seized items will be conducted by personnel assigned to the Computer Analysis Response Team (CART), who are certified by the FBI to conduct such types of examinations. These

personnel will use computer forensic hardware and/or software which has been approved for use in conducting such examinations.

## VI. CONCLUSION

Based on the foregoing, there is probable cause to believe that, from on or about September 25, 2010, to on or about August 23, 2011, JUBAIR AHMAD has unlawfully engaged in the offense of providing material support and resources to a designated foreign terrorist organization, in violation of 18 U.S.C. § 2339B, and from on or about August 23, 2011, he unlawfully made material false statements, in violation of 18 U.S.C. § 1001(a)(2), in a matter involving international terrorism as defined in 18 U.S.C. § 2331. There is also probable cause to believe that within JUBAIR's residence at ███████████████ as described in Attachment A, there is evidence of said offense, as more particularly described in Attachment B.

_____
Daudshah S. Andish
Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me this 1st day of September 2011, in the City of Alexandria, VA.

_____/s/_____
Ivan D. Davis
United States Magistrate Judge