IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 1:11cr554 |
| | ) | |
| JUBAIR AHMAD, | ) | Honorable T.S. Ellis III |
| | ) | |
| Defendant | ) | |

**SUPPLEMENTAL POSITION OF THE UNITED STATES
WITH RESPECT TO SENTENCING**

The United States previously submitted its position on the sentencing of JUBAIR AHMAD ("AHMAD"). This supplemental pleading is restricted to responding to the Defendant's Sentencing Memorandum ("AHMAD's Sentencing Memorandum").

1.  AHMAD's Military Training

The defense is correct that AHMAD attended the first two stages of LeT paramilitary training - Dora Suffa and Dora A'ama.[1] The defense is also correct that the third stage, Dora Khasa is the "advanced course," and that AHMAD had a letter of recommendation from the local LeT office to attend this course, but he was turned away because he was too young and skinny. AHMAD's Sentencing Memorandum at 7.

Yet none of those facts should inure to AHMAD's benefit. He did everything he could to attend an LeT paramilitary training course, and it was only events out of his control that

---

[1] The government and the defense have employed slightly different spellings for this training. The government spelled them Dora Suffa, Dora A'ama and Dora Khasa while the defense spelled them Daura-e-Suffa, Daura-e-Aama and Daura-e-Khasa. However there is no dispute that these are the three stages of LeT training.

prevented him from doing so.  Moreover, after having been turned away, and after the passage of time and distance, AHMAD continued to express a desire to complete the advanced LeT training. In July 2010, when he was 23 years old, AHMAD told an associate, "I had gone to do the Khasa. Brother Nisar sent me back. He said, "You are too young right now." . . . There was a lot of enjoyment [there]."  When the associate asked if he intended to try again, AHMAD replied, "God willing."[2]

AHMAD later told another individual, in October 2010, that, "brother Nasar suggested he go to Muridke and study for now, *then do it*."[3] [Emphasis added].  Later that same month, AHMAD told another associate that, "God willing, next year will [be] with 72" (a thinly-veiled reference to the belief that a jihadist who has died a martyr's death will be rewarded with that number of virgins in heaven).[4]

Thus, even if it is possible to blame AHMAD's attendance at the first two LeT training courses on his youth and impressionability, there is nothing to excuse his desire, as a 23-year-old adult living in the United States, to undertake the most serious LeT training and then to go be martyred.  And make no mistake, AHMAD did not hide his desire to use the advanced LeT training as a path to martyrdom.  In January 2011, he told an associate, "Thinking abt [about] my future. What I'll do, and what not to do?. . . I have to get married, I have to make the dora "tour" [Dora Khasa], [I ]have to be launched too."[5]

---

[2] Tab U, Position of the United States with Respect to Sentencing.

[3] Tab V, Position of the United States with Respect to Sentencing.

[4] Tab BB, Position of the United States with Respect to Sentencing.

[5] Tab W,  Position of the United States with Respect to Sentencing.

2. The Production of the Propaganda Video

The defense has done an able job of describing the target audience that AHMAD's video was designed to reach:

> "Every Pakistani is subjected from childhood to propaganda on Kashmir, in school as well as in the family and through the official media. The cumulative effect of this propaganda has a strong impact on teenagers, who see every day on TV Indian soldiers beating Kashmiris and hear the most horrible stories of children burnt alive or slaughtered in front of their mothers, who are then forced to drink their blood, and especially stories of girls and women raped by Indian solders in front of their menfolk." MARIAM ABOU ZAHAB, THE PRACTICE OF WAR 140 (2007). This environment has allowed groups such as LeT to flourish in Pakistan.

AHMAD's Sentencing Memorandum at 5. Yet this underscores how insidious the video that AHMAD prepared and put on the Internet for LeT was. Given the "strong impact" that this sort of propaganda has on teenagers, it is certain that AHMAD's actions were destined to reach an audience which was eager to act against the supposed injustice that AHMAD portrayed. This is precisely why a sentence of 180 months is warranted in this case.

Having lived in Pakistan for 19 years, and having attended two LeT training courses (as well as having attempted to attend a third), AHMAD was intimately familiar with LeT and its ability to appeal to a new generation of jihadis. Therefore, there is no way to view his production of the propaganda video as an innocent lapse. On the contrary, he, more than anyone, would have known the potential of such a video. It would be viewed as a call to arms by many people in Pakistan.

Thus, it is hardly surprising that he willingly constructed it as Talha Saeed directed. He played Hafiz Saeed's voice reciting a prayer about jihad and the mujahideen. He portrayed gruesome images of supposed atrocities against Muslims. And then, after attempting to incite his

audience with these bloody images, he showed what can only be described as the violent response to this injustice - images of IED attacks on military vehicles, mujahideen with their faces covered carrying weapons, and other images designed to portray, and glorify, the violent actions of the mujahideen.

The defense claims that, "Mr. [Talha] Saeed suggested edits, and Mr. Ahmad made some of the edits and ignored others" in making the video. AHMAD's Sentencing Memorandum at 9. However this description fails to capture how eager AHMAD was to construct a video that was compelling and powerful. At one point, AHMAD suggested to Talha Saeed that they use an image of Mumbai to show the power of LeT. This was certainly a reference to LeT's notorious attack on Mumbai which was launched on November 26, 2008 and which resulted in the deaths of over 160 people, including six Americans. The fact that AHMAD focused on the Mumbai attack is telling. It demonstrates that he is fully aware that LeT was behind this attack and he wanted LeT to use that attack as a propaganda tool.[6] It is also interesting that Talha Saeed rejected this suggestion. Even for the son of the LeT leader, the Mumbai attack was too controversial to include in AHMAD's video.

3. <u>A Sentence of 24 Months is Insufficient to Satisfy the 3553(a) Factors</u>

In the defense sentencing memo, the 18 U.S.C. § 3553(a) factors are correctly cited, including the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence, to protect

---

[6] AHMAD's willingness to attribute this attack to LeT is interesting given that there are many conspiracy theories in Pakistan which continue to dispute this fact. Yet he (and Talha Saeed) both obviously know that the conspiracy arguments are not true, and that this was, in fact, the handiwork of highly trained terrorists who had gone through the LeT paramilitary courses.

the public from further crimes of the defendant and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. AHMAD's Sentencing Memorandum at 11.  Yet the defense fails to explain how a sentence of only 24 months satisfies these factors.

Providing material support to a Foreign Terrorist Organization is a serious offense, but such a short sentence would neither reflect that seriousness, nor promote respect for the law. Similarly, this does not seem to be a just punishment, especially where other similarly situated defendants have been sentenced to much lengthier sentences.  *See discussion at # 6, infra*.  Also, this proposed sentence is far too short to promote deterrence in others, and it does not appear that it would credibly protect the public from further crimes of this defendant.  As the defense points out, if here were sentenced to 24 months in prison, AHMAD would only be 26 years old upon his release.  AHMAD's Sentencing Memorandum at 20.  It seems doubtful that he could be rehabilitated from his admiration for LeT in such a short period of time, especially when he is likely to return to Pakistan after his release, a place where LeT is such a prevailing force according to the defense memorandum.  AHMAD's Sentencing Memorandum at 3-7.

   4.  <u>There are Sound Policy Reasons for a Sentence of 180 Months in this Case</u>

There is no dispute that the so-called "terrorism enhancement" pursuant to U.S.S.G. § 3A1.4 applies in this case.  In fact, the defense stipulated to that enhancement in the plea agreement.  Plea Agreement at 3.  This is hardly surprising, given that as they acknowledge in their sentencing memorandum, AHMAD "advocated violence, almost exclusively against the Indian army in Kashmir."  AHMAD's Sentencing Memorandum at 2.  By its terms, the terrorism enhancement applies whenever one or more offense of conviction involved, or was intended to

5

promote, a "federal crime of terrorism." U.S.S.G. § 3A1.4(a). The Guidelines define "federal crime of terrorism" by referring to 18 U.S.C. § 2332b(g). *See* U.S.S.G. § 3A1.4, comment. (n.1). That statute, in turn, defines "federal crime of terrorism" as *any offense* that "is calculated to influence or affect the conduct of the government by intimidation or coercion, or to retaliate against government conduct" and that violates one of a number of specified federal statutes. 18 U.S.C. § 2332b(g)(5); *United States v. Hammoud*, 381 F.3d 316, 354 (4th Cir. 2004) (*en banc*). Where U.S.S.G. § 3A1.4 applies, the offense level is increased by 12, and a Criminal History Category VI is to be applied.[7]

In this case the offense of conviction, 18 U.S.C. § 2339B, is an enumerated offense under 18 U.S.C. § 2332b(g)(5)(B)(1). Therefore, we have a qualifying felony, and the defense has stipulated that this enhancement applies. By so stipulating, the defense has acknowledged that when AHMAD committed this offense, he intended to influence or affect the conduct of the government by intimidation or coercion, or to retaliate against government conduct.

So not only did AHMAD provide material support to a Foreign Terrorist Organization, but when he did so he possessed a particular *mens rea*. He had the specific intent to influence the conduct of a government (in this case the Indian government), by intimidation or coercion or because he wanted to retaliate against them. AHMAD did not commit this offense by accident. He did not commit it for pecuniary gain or because he really liked and admired Talha Saeed. He did so because he had been indoctrinated into the LeT mind-set, which was a mind-set that viewed the Indian government as an enemy to be attacked whenever and wherever possible -

---

[7] The defense agrees that this is a correct calculation. AHMAD's Sentencing Memorandum at 22.

"[t]he objective of Lashkar's fidayeen attacks was not for the fighters to be martyred right away, but to inflict as much damage as possible on the [Indian] enemy in order to inspire fear in others." *Stephen Tankel, Storming the World Stage, The Story of Lashkar-e-Taiba 48 (2011).* AHMAD's Sentencing Memorandum at 3. Given the serious offense of which this defendant stands convicted, and given his mind-set when he committed it, there is no basis to depart from the sentence called for by the Sentencing Guidelines in this case.

     5.     The Humanitarian Law Project Opinion

The defense obviously does not claim, because it cannot, that AHMAD's conduct in this case is First Amendment protected. And to their credit, they acknowledge as much, "[t]he fissures in the First Amendment's freedoms of association and speech are not offered as an excuse for Mr. Ahmad's criminal conduct." AHMAD's Sentencing Memorandum at 18. The reality is that AHMAD's conduct in producing a gruesome propaganda video for LeT constituted the crime of providing material support (a "service" as well as "expert advice and assistance") to a Foreign Terrorist Organization.

AHMAD's actions when he communicated about LeT belie any notion that he thought that what he was doing may have been legal. For example, in January 2011, when he was trying to find an address where an associate, whose initials are RU, could give money to LeT, he corresponded with an individual and told him that he had "a friend who wants to do business with the factory."[8] The two of them conversed about the factory, but they never used the name LeT. Later, AHMAD searched the Internet to look for an address for LeT, and he accessed

---

[8] Tab L, Position of the United States with Respect to Sentencing.

7

articles titled. "Banned terrorist outfits resume activities in Karachi," and "Lashkar-e-Tayiba is ready to hit again."[9]

For years before his arrest, AHMAD engaged in trade-craft to conceal his activities on behalf of LeT. He used coded language, he avoiding talking openly about LeT, and he maintained the lowest possible profile. This all reflects the fact that he was fully aware that LeT was a Designated Foreign Terrorist Organization here in the United States (as well as also being banned in Pakistan), and he knew that providing material support to them was a crime.

6. <u>Comparing this Defendant to Defendants in other Cases</u>

In arguing for a sentence of 24 months in this case, the defense has looked to other terrorism cases as a guide. However trying to compare a particular case, with its own particular set of facts, with cases from many different districts, involving many different defendants, and without an understanding of all of the unique facts at issue is, in the words of the Fourth Circuit, "tantamount to comparing the incomparable." *See, e.g., United States v. Abu Ali,* 528 F.3d 210, 264 (4th Cir. 2008)("Indeed, any comparison between Abu Ali and [John Walker] Lindh rests on such dramatic differences that Lindh's case cannot serve as a basis for any useful comparison-let alone one that makes imposing a significant variance sentence 'necessary.' As a result, any comparison to Lindh's case would be tantamount to comparing the incomparable, and thus was misplaced.").

As the defense readily acknowledges in the survey of cases that it provides, the average sentence where a defendant pled guilty to at least one 2339B offense is 107.91 months in prison.

---

[9] Tab Q, Position of the United States with Respect to Sentencing.

AHMAD's Sentencing Memorandum at 29. If anything this figure should weigh in favor of much more than 24 months in prison. Especially because we do not know enough about those other cases to know how many of them were the result of plea agreements where the defendant was rewarded for providing substantial assistance.[10] And we also do not know if there were facts in those other cases which, for tactical or evidentiary reasons, led to the terrorism enhancement not being imposed.

We would also take issue with the defense characterization that this case "involves providing material support to a foreign terrorist organization over the internet and without actual violence." *Id*. The reason that terrorism cases are viewed so seriously by Congress and the Sentencing Commission is precisely because a seemingly mundane action, such as posting a video on the Internet, can have such deadly consequences. While the posting of it, was not, in and of itself, a violent act, AHMAD's intent in posting it was to inspire others to *engage* in violent acts. It was posted on behalf of LeT, in order to attract recruits to LeT, so that they could continue to engage in their ongoing conflict with the government of India.

The defense also tries to downplay the impact of this video by arguing that there is "no way to know if it was ever downloaded or if it remains available at all." *Id*. While this could be possible, it is difficult to believe that a video that was posted on YouTube, which was available

---

[10] In the instant case AHMAD's plea agreement does have a cooperation provision. While he has met with and been de-briefed by the government on a number of occasions, he has not provided information to date which would rise to the level of substantial assistance. And if he does receive a sentence as low as 24 months, it is difficult to see how he would have much of an incentive to provide any assistance in the future.

9

to any computer in the world with Internet access, has now completely disappeared.[11]  Especially when it was uploaded to assist a group like LeT which the defense describes as having "a professional media organization."  *Id*.

For the foregoing reasons, as well as those included in our initial pleading setting forth the government's position on sentencing, a term of imprisonment of 180 months is necessary to

---

[11] The defense also argues that whether this video remains on the Internet or not, it was not widely disseminated.  AHMAD's Sentencing Memorandum at 29-30.  Yet this is precisely the point.  The impact of this video is not that it reach a wide audience, but that it reach a *specific* audience.  AHMAD's goal was not necessarily to educate the world about LeT (in fact doing so may have brought unwanted attention to the group).  Rather, his goal was to get the video out to like-minded individuals who would be galvanized by what they saw in there.  If he could reach this particular group, he would have a greater chance of securing some new recruits to LeT's deadly cause.

reflect the seriousness of the defendant's offenses, promote respect for the law, provide just punishment for the defendant's offenses, and afford adequate deterrence to criminal conduct.

          Respectfully submitted,

          Neil H. MacBride
          United States Attorney

    By:      /s/
          W. Neil Hammerstrom, Jr.
          Assistant United States Attorney
          Virginia Bar No. 24588
          Counsel for the Government
          United States Attorney's Office
          2100 Jamieson Avenue
          Alexandria, VA 22314
          (703) 299-3755
          (703) 299-3982 (fax)

          John T. Gibbs
          Trial Attorney
          Counterterrorism Section
          National Security Division
          U.S Department of Justice

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on April 12, 2012, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system which will then send a notification of such filing (NEF) to the following:

> Counsel for Defendant
> Brian L. Mizer, Esq.
> Aamra S. Ahmad, Esq.
> Assistant Federal Public Defenders
> Office of the Federal Public Defender
> 1650 King Street, Suite 500
> Alexandria, VA 22314

> /s/
> W. Neil Hammerstrom, Jr.
> Assistant United States Attorney
> Virginia Bar No. 24588
> Counsel for the Government
> United States Attorney's Office
> 2100 Jamieson Avenue
> Alexandria, VA 22314
> (703) 299-3755
> (703) 299-3982 (fax)