```
         IN THE UNITED STATES DISTRICT COURT FOR THE
                   EASTERN DISTRICT OF VIRGINIA
                      Alexandria Division

UNITED STATES OF AMERICA,          )
                                   )
                   Plaintiff,      )
                                   )
        v.                         )   CRIMINAL ACTION
                                   )
JUBAIR AHMAD,                      )   1:11-cr-554
                                   )
                   Defendant.      )
                                   )
```

REPORTER'S TRANSCRIPT

SENTENCING HEARING

Friday, April 13, 2012

---

BEFORE:        THE HONORABLE T.S. ELLIS, III
               Presiding

APPEARANCES:   WILLIAM N. HAMMERSTROM, JR. AUSA
               JOHN GIBBS, AUSA
               United States Attorney's Office
               2100 Jamieson Ave.
               Alexandria, VA 22314

                  For the Government

               BRIAN LEE MIZER, ESQ.
               Office of the Federal Public Defender
               1650 King St., Suite 500
               Alexandria, VA  22314

                  For the Defendant

                         ---

               MICHAEL A. RODRIQUEZ, RPR/CM/RMR
                    Official Court Reporter
               USDC, Eastern District of Virginia
                    Alexandria, Virginia

INDEX


ALLOCUTION BY THE DEFENDANT                          5

ALLOCUTION ON BEHALF OF THE DEFENDANT                8

ARGUMENT BY THE GOVERNMENT                           22

IMPOSITION OF SANCTIONS/SENTENCE BY THE COURT        37

(Court adjourned)

1          THE CLERK:   Case Number 11, Criminal 554,

2    United States of America versus Jubair Ahmad.   Will

3    counsel please state your appearance for the record.

4          ATTORNEY HAMMERSTROM:  Good morning your

5    Honor, Neil Hammerstrom and John Gibbs for the United

6    States, and Mr. Gibbs will be arguing the sentencing

7    factors for the Court this morning.

8          THE COURT:  All right.  Good morning, Mr.

9    Gibbs and Mr. Hammerstrom.

10          ATTORNEY GIBBS:  We also have Dave Anders

11    from the FBI at counsel's table, Judge.

12          THE COURT:  All right.  Good morning to you

13    as well.

14          ATTORNEY MIZER:  Good morning, Brian Mizer

15    on behalf of Mr. Ahmad, who is present.

16          THE COURT:  All right.

17          Good morning to you.

18          Good morning, Mr. Ahmad.

19          THE DEFENDANT:  Good morning, your Honor.

20          THE COURT:  All right.

21          This matter is before the court, this

22    defendant having been found guilty on the basis of a

23    plea of having of violated 18 U.S.C. Section 2339B,

24    which is providing material support and resources to a

25    designated foreign terrorist organization, in this case

1    LeT.

2              The record reflects that this defendant

3    participated in the production, staging and creation of

4    a video to be used to recruit members to LeT to serve

5    as -- to serve as members in carrying out terrorist

6    activities.  He also assisted in recruiting persons to

7    do the same.

8              All right.  Mr. Mizer, have you had an

9    adequate opportunity it review the presentence report

10   and to review it with your client?

11             ATTORNEY MIZER:  I have, your Honor, yes.

12             THE COURT:  Mr. Ahmad, have you had an

13   adequate opportunity it review the presentence report

14   and to review it with your counsel, Mr. Mizer?

15             THE DEFENDANT:  Yes, sir, I do.

16             THE COURT:  And are you fully satisfied with

17   his advice and counsel in this case?

18             THE DEFENDANT:  Yes, sir.

19             THE COURT:  All right.

20             Sir, you may be seated.

21             Do you have any objections, Mr. Mizer, to

22   the presentence investigation report?

23             ATTORNEY MIZER:  No, your Honor, none.

24             THE COURT:  And, Mr. Gibbs, is it?

25             ATTORNEY GIBBS:  Yes, sir.

1          THE COURT:  Mr. Gibbs, I take it -- I asked

2     routinely whether the defense and the government have

3     had occasion to review the report, but of course I have

4     literally several hundred pages reflecting that you

5     have, but do you have any objections or corrections?

6          ATTORNEY GIBBS:  None whatsoever, Judge.

7          THE COURT:  All right.  The Court will adopt

8     the findings and conclusions of the presentence

9     investigation report as the Court's findings and

10    conclusions in this matter.

11         And I'll also make a part of the presentence

12    investigation report -- no, I don't need to make a part

13    all of these attachments.  Is there anything, Mr. Mizer,

14    in your submission that you think should be made a part

15    of the presentence report?  I did not see anything.

16         ATTORNEY MIZER:  No, your Honor.

17         THE COURT:  All right.  We are now at the

18    point of allocution.  This is your opportunity now,

19    Mr. Ahmad, to address the Court and to say anything that

20    you wish to the Court by way of extenuation or

21    mitigation or, indeed, anything you think the Court

22    should know before sentence is imposed.

23         Now, you are not required to say anything if

24    you don't wish to.  But you do have the opportunity to

25    say something if you do wish to, and this is your

1    opportunity.

2              Do you wish to addressed the Court?

3              THE DEFENDANT:  Yes, I want to say a couple

4    of things.  First, I want to mention one incident

5    happened to me in the jail house.  I was talking to my

6    counselor of our block, and she asked me --

7              THE COURT:  Talking, I'm sorry, to your

8    counselor about what?

9              THE DEFENDANT:  Of our block.  She asked

10   me --

11             ATTORNEY MIZER:  Cell block, your Honor.

12             THE COURT:  Oh, cell block.  Yes.

13             THE DEFENDANT:  She asked me if I am

14   citizen.  I said, "no, I have green card."  And she was

15   like so they're going to --

16             THE COURT:  I'm sorry, Mr. Ahmad, I will

17   make a little bit more of an effort to understand you.

18   Your English is good, but I am -- my hearing is not as

19   good as your English.  Try it again.

20             THE DEFENDANT:  Yes.  I was saying like I

21   was talking to my -- our counselor of our block and she

22   asked me if I am citizen.  I told her, "no, I have a

23   green card.  I am not citizen."  So she was like, "so

24   they are going to send you back to Pakistan."  I say,

25   "yes."  And so she was like, "so you still hate

1    Americans?"

2                  So this question kind of upset me.  I told

3    her, you know, I don't hate Americans.  I was working

4    with Americans, so why would I hate them.  So, I just

5    wanted to mention this in the court.  People have this

6    kind of thinking and the Judge, these other people, this

7    kind of ignorance, you know.

8                  And second thing about the video I made, I

9    did not know this matter would be that serious.  I

10   thought it's just a video, you know.  And I realize I

11   broke the law, and I am sorry for that, and I won't do

12   it during my presence in the United States.  And I hope

13   you would give me a second chance, and that's it.  Thank

14   you.

15                 THE COURT:  What will you do when you go

16   back to Pakistan?

17                 THE DEFENDANT:  Well, right now I am

18   planning to get married and start something, some

19   business, some kind of business.

20                 THE COURT:  And resume your connection with

21   LeT?

22                 THE DEFENDANT:  Not really, no.

23                 THE COURT:  Why not?

24                 THE DEFENDANT:  Because I realized, you

25   know, it's not right thing to do.

1          THE COURT:  All right.

2          You may be seated.

3          THE DEFENDANT:  All right.  (Complied).

4          THE COURT:  Mr. Mizer?

5          ATTORNEY MIZER:  Thank you, your Honor.

6          I wanted to started with one point of

7    clarification, your Honor.  The government in its two

8    sentencing papers refers to a conversation by Mr. Ahmad

9    and Talha Saeed, the son of the founder of

10   Lashkar-e-Tayyiba, and I think that there is an issue

11   with the timing of this chat, and it's at tab B for your

12   Honor's reference.

13          At tab A you will see that a lot of these

14   conversations are taking place -- there is an

15   overlapping conversation, if you will.  And one person

16   is talking on a microphone in a Pakistani forum called

17   Balux, and then Mr. Ahmad or Talha Saeed will

18   simultaneously be typing or instant messaging.

19          And really this conversation that takes

20   place at tab B is not listed in the correct order.  And

21   it's important because the government makes much of this

22   reference to the Mumbai attacks.  And if I could just

23   explain how that actually took place and was actually

24   overlaid I think it will be important for the Court.

25          Mr. Ahmad doesn't dispute he is the

1    individual that says, "Should I paste in the Mumbai

2    one," but you will look at that very next line, which is

3    again Mr. Ahmad saying, "double L," which is lots of

4    laughs or laugh out loud.  The reason that that is

5    important, Judge, is because this is Mr. Ahmad speaking

6    with, again, a member or the son of a member of this

7    terror group, who is saying, "should I make this video

8    about how LeT is responsible for the Mumbai attacks?"

9            It's a joke, your Honor.  And if the entire

10   transcript was there of the audio on the other side,

11   Talha Saeed is even heard to laugh in response to this.

12   Because as the government quite accurately points out in

13   its second submission, LeT has never taken

14   responsibility for the Mumbai attack, and many

15   Pakistanis including Mr. Ahmad believe the bizarre

16   conspiracy theories about that attack.

17           What takes place between that, your Honor,

18   is actually the audio, which is later down in tab B.

19   And so after Mr. Ahmad says, "Should I list the Mumbai

20   one," and then the double L, Talha Saeed, and you can

21   see a reference to this.  LeT me free up the mike.  And

22   so it goes back and forth with this microphone.  And

23   there is a discussion where Talha Saeed says,

24   "Seriously, don't put anything about Mumbai in there."

25           And then later on in that chat is,

1    "Definitely put that Pakistan's nuclear -- all of a

2    sudden the mountains of Chagi."  And then Mr. Ahmad

3    replies, "We will have to show our power."  So that

4    "We'll have to show our power" is a reference to the

5    Chagi nuclear test as these conversations are properly

6    overlapped.

7              And that's important, your Honor, because at

8    two minutes and 33 seconds into this video, the very

9    middle of the video you see something that made no sense

10   to me at first.  There appears to be a smoking mountain,

11   until last night I went and looked at that clip, and

12   it's dated May 23rd 1998, which is the date of

13   Pakistan's last nuclear test.  So in the center of this

14   video, it's not anything about Mumbai.  It is the

15   testing of Pakistan's nuclear weapons.

16             Immediately following that is conventional

17   weaponry possessed by the state of Pakistan, a British

18   Tornado fighter bomber and then Shaheen One and Shaheen

19   Two, which are Pakistan's missiles that were developed

20   with the assistance of China, that are capable of

21   launching those nuclear weapons at India should nuclear

22   war erupt.

23             And I think that that's important, your

24   Honor, because this video is much a nationalist video.

25   I mean, it shows an American fighter plane, an F-16 that

1    sold to Pakistani government by the United States, in as

2    much as it is a Jihadi video.  And Mr. Ahmad isn't

3    disputing that Jihad is a component of this video, but

4    references to lawful weapons including fighter bombers

5    is also a focus of this video.

6            And I think that that's important because

7    what I tried to lay out in the sentencing papers, your

8    Honor, is Pakistan's entire focus is on India, and

9    Pakistan's entire range of weapons, which range from

10   nuclear weapons all the way down to private armies like

11   LeT, that the Pakistani fields -- Pakistani state fields

12   in Kashmir to combat the overwhelming military

13   superiority -- excuse me -- of the Indian army.

14           I raise that, your Honor, because I think

15   it's important to understand how a man like Mr. Ahmad

16   who grows up in Pakistan until age 19 who may not

17   appreciate, as he just told the Court, the wrongfulness

18   of this group.  He certainly realizes it now.  We have

19   had many hours of conversations.  He's met with the FBI

20   on any number of occasions, and he can appreciate that

21   distinction now.  But certainly at the time when he was

22   conducting this chat and making this video, he certainly

23   comes from a different background than, say, someone who

24   grows up in this country and then goes to train in the

25   terror camps in Pakistan.

1          And really, your Honor, this group,

2     Lashkar-e-Tayyiba, JUD, FIF, whatever name it wants to

3     go by at the present time is really unlike any foreign

4     designated terrorist group, I mean, in the way that it

5     operates openly in the state of Pakistan.  It is still a

6     lawful organization, JUD, one part of it.  It's still a

7     lawful organization in the state of Pakistan.

8          As some indication, your Honor, I would

9     point out that Hafiz Muhammad Saeed, who now has a

10    bounty on his head by the United States Government,

11    filed a lawsuit several months ago in a court in Lahore

12    against US drone strikes in Pakistan.  I mean, this is a

13    group that has a legal team and an individual that lives

14    at a fixed address and that is making court appearances.

15    And so it is distinguishable from a group, say, the

16    Taliban or Al Qaeda, which is more of a clandestine

17    organization, and which there could be --

18         THE COURT:  Taliban isn't clandestine.

19    Taliban is entirely Afghanistan.  There are people who

20    are members of it who live in Pakistan, especially in

21    the western -- the tribal areas, but it's an

22    Afghanistan, an Afghan operation.  Al Qaeda is an

23    international conspiracy.

24         ATTORNEY MIZER:  Yes, your Honor.

25         THE COURT:  And operates openly in Pakistan.

1    ATTORNEY MIZER:  Your Honor, I don't know

2    that -- I think I would disagree with the Court that it

3    operates openly --

4    THE COURT:  Maybe openly is a wrong word,

5    but if the head of the thing, if the leader of it,

6    spiritual and otherwise lives a couple miles away from

7    their military academy for a long period of time,

8    then -- in other words, I don't much regard for their

9    legal system.  The fact that LeT may be legal or not

10   illegal in Pakistan doesn't make a hill of beans to the

11   fact that it's a terrorist organization, so designated.

12   ATTORNEY MIZER:  Absolutely, your Honor.

13   And I raised it only to suggest that Mr. Ahmad -- the

14   impact that that may have had on Mr. Ahmad's state of

15   mine.  I mean, he has grown up in Pakistan.  He left

16   Pakistan when these groups were not even banned by the

17   United States.  I mean, JUD was banned after Mr. Ahmad

18   came to the United States.  I mean, he grew up seeing

19   these groups open -- operate --

20   THE COURT:  All right.  I take that point.

21   ATTORNEY MIZER:  Yes, your Honor.

22   THE COURT:  And he went to the LeT camps, I

23   think you pointed out, when he was 14 or 15.

24   ATTORNEY MIZER:  Yes, your Honor.

25   THE COURT:  At least phase one and phase

1    two, and he didn't make phase three because he was too

2    young and too skinny.

3              ATTORNEY MIZER:  That is right, your Honor.

4    And then he came to the United States and has taken no

5    other action off of the Internet to effectuate a desire

6    to return to Pakistan or to --

7              THE COURT:  Well, I think the video and the

8    recruiting is certainly actions.

9              ATTORNEY MIZER:  Yes, your Honor.  And what

10   I was about to say --

11             THE COURT:  That is what is the heart of the

12   illegal conduct is the video and the recruiting.

13             ATTORNEY MIZER:  No additional conduct

14   offline, your Honor, and that's I think an important

15   distinction.

16             THE COURT:  Well, he's not -- yes.  He is

17   not before the court on any other conduct than that.

18             I think that's right, isn't it, Mr. Gibbs?

19             ATTORNEY GIBBS:  That is correct, Judge.

20             THE COURT:  All right.  What else do you

21   have, Mr. Mizer?

22             ATTORNEY MIZER:  Your Honor, the heart of

23   this case is a five-minute video, images gathered from

24   the video -- from the Internet, not images that

25   Mr. Ahmad shot himself and that he assembled online.

1    That is the heart of this case.  We don't dispute that

2    videos can be important, Judge, but because some videos

3    are important doesn't mean that all videos that are

4    posted online are important.

5           And certainly there are videos by well-known

6    makers, such as Anwar Al-Awlaki or Adam the American

7    Gadahn, which the United States and the Defense could

8    come in and say here is a criminal case where it was an

9    individual inspired by Anwar Al-Awlaki.  I mean, those

10   cases are legion in the federal courts at this point.

11          But just all terror groups are not the same,

12   Judge, all videos are not the same.  Just because a

13   video has potential impact or one video does doesn't

14   mean that Mr. Ahmad's video does.  These videos were

15   posted in October and September of 2010, Judge, and the

16   government can't present a name of a single individual

17   that saw these videos much less was impacted or

18   convinced to join violent Jihad because of these videos.

19          And we know again that there are individuals

20   that do watch certain videos and are inspired to violent

21   conduct by them.  And so I think that that suggests not

22   that Mr. Ahmad shouldn't be punished but there's kind of

23   speculation as to how severe that punishment should be

24   for this video.  Mr. Ahmad realize he was wrong.  He

25   provided material support to a designated terrorist

1    organization, but it's qualitatively different than much

2    of the propaganda that is cited in the government's

3    papers and some of the individual that have made that

4    propaganda.

5         Your Honor, with respect to the 3553(A)

6    factors this court must fashion a punishment.  I won't

7    rehash the guidelines argument that we present in the

8    papers, that Congress intervened before there was a

9    material support for terrorism guideline a half a decade

10   before and created this terrorism enhancement for other

11   federal crimes.

12        And when the sentencing commission put in

13   place the guidelines for material support for terrorism

14   you have essentially a guideline that has a -- there is

15   a terrorism enhancement for the material support for

16   terrorism guideline, and what that results in is every

17   single case having a guideline range if it wasn't

18   restricted by the statutory cap of twice the statutory

19   cap, your Honor.  And we would submit that this is

20   precisely the type of situation under Gall and Kimbrough

21   where this court could depart from those guidelines

22   because --

23        THE COURT:  Well, I don't have any choice

24   but to depart because the guideline are above the

25   statutory maximum.

1          ATTORNEY MIZER:  Well, they put it right at

2     15 years, your Honor.  And according to the Guidelines

3     Commission every single material support for terrorism

4     case should be sentenced to 15 years.

5          THE COURT:  And many of them are.

6          ATTORNEY MIZER:  Many of them are, your

7     Honor, but as we put in the papers many of them are not,

8     and there are many cases --

9          THE COURT:  Well, you cite an interesting

10    article, which I have in front of me.

11         ATTORNEY MIZER:  Yes, your Honor.

12         THE COURT:  From this Lewis and Clark Law

13    Review.  In fact, the whole thrust of the article has

14    really nothing to do with the issues that you raised.

15    Somehow or the other this professor thought it was

16    significant to investigate whether the Justice

17    Department's narrative was accurate or not accurate in

18    terms of the punishment of providing material aid to

19    the -- to the terrorist organizations.

20         But what it does show is that there are a

21    number of these 23 B to -- I'm sorry, 2333 through 39(B)

22    convictions.  I don't know that he has all of them.  I

23    don't know that he purports to have all of them.  But

24    there are quite a few of them that are significantly --

25    that are at the 15- or close to the 15-year period.  Am

1    I wrong?

2              ATTORNEY MIZER:  That's correct, your Honor.

3              THE COURT:  And some from this courthouse.

4              ATTORNEY MIZER:  Yes, your Honor.  And in

5    our pleading we've made an effort to update.  That

6    article I think is 2007 time frame, and with the charts

7    and in our papers we have attempted to update cases

8    since that time frame.  And I think that two cases are

9    important are Number 26 and Number 27 on that list, your

10   Honor, which involve the same organization, which

11   involve men who as adults went to Pakistan, took

12   advanced training in these camps and was prepared to

13   actually engage in violence.  I mean the so-called

14   paintball cases, your Honor.  And those two individuals

15   were sentenced to 38 months apiece in this courthouse.

16             I think that's important, your Honor, simply

17   for the 3553(A) factors in dealing with unwanted

18   sentencing disparities.

19             Judge, with respect to the history and

20   characteristics of this accused, we have years of

21   monitored chats, and Mr. Ahmad is not minimizing the two

22   series of conversations that the government has raised

23   or this video, nor is he suggesting that he talked about

24   attending further camps when he was an adult, a

25   23-year-old, as the government points out.

```
 1            But, your Honor, Mr. Ahmad has been here for

 2    five years.  He's made no attempt to go aside from after

 3    this case arose the government informed him that he had

 4    engaged in criminal conduct, and then he made an attempt

 5    to return to Pakistan.  But aside from that incident

 6    there has been no action on Mr. Ahmad's part besides

 7    speaking on the Internet about these topics.

 8            And, your Honor, I think you can see from

 9    the letters that Mr. Ahmad submitted --

10            THE COURT:  He was recruiting people on the

11    Internet.

12            ATTORNEY MIZER:  Yes, your Honor.  There was

13    a conversation about -- with one individual about having

14    this individual's fiance attend the same basic camp that

15    he attended at the age 14.  Properly put in context,

16    your Honor, that conversation is there attending a

17    three-week religious indoctrination course with some

18    basic weapon familiarization, your Honor, that many

19    individuals -- and I think it's a testament to how --

20            THE COURT:  Well, he said if he had been

21    able to he would have gone on; and if you go on, then

22    what do you do with a full, all three phases?  You don't

23    go back to watching daytime TV.  You go out and commit

24    acts of terrorism.  Am I right or wrong?

25            ATTORNEY MIZER:  Well, I think somewhat is
```

1    the answer to that, your Honor.  I think if LeT and the

2    Pakistani state believed that it is time to engage the

3    Indian army in Pakistan and launch that mission then,

4    yes, that is what happens, your Honor.  But I don't know

5    that that's an automatic consequence that you go to that

6    training and then automatically you are launched.

7          I think it's important in the four years

8    since the Mumbai attacks there hasn't been an additional

9    terrorist act attributed to LeT.  So we know that these

10   camps are operating, and so if it is this kind of

11   situation where you automatically go to this camp and

12   then terrorism results, I think it's much more nuanced

13   than that, respectfully, your Honor.

14         But, importantly, Mr. Ahmad made no effort

15   during that five-year period to go and accomplish

16   anything that he has talked about online, and I am

17   referencing the letters of the individuals who know Mr.

18   Ahmad offline, your Honor.  His foreman who spent

19   eight-hours days with him and who says he is an honest,

20   law-abiding citizen who wouldn't hurt anyone.

21         Judge, I think it's -- I haven't seen in

22   another terrorism case where their employer is saying

23   can you send him back to us and send him back to work

24   with us.  And I think that that is a testament to their

25   perception of this individual not on these written pages

1    but in real life, your Honor, and how this man's work

2    ethic and his peaceful nature outside of the Internet.

3            Your Honor, Mr. Ahmad concedes that there

4    must be some period of deterrence.  And again he didn't

5    realize the -- the -- I think the severity of this, your

6    Honor.  When Mr. Ahmad and I first sat down, he was

7    wanting essentially a time-served sentence for this.  I

8    convinced him, your Honor, it's much more serious than

9    that, and that's why we have come to ask the Court for a

10   24-month sentence, which, your Honor, we believe is a

11   very stiff sentence for a five-minute video in this

12   case.

13           He worked on it for approximately two days.

14   That's a year in prison for each of the days that he

15   worked on this video.  We think if you lay this out

16   alongside those 20 or 30 cases that we put that this is

17   certainly the lower end of the spectrum of the material

18   support for terrorism cases that this court has seen and

19   that have been prosecuted federally in the country.

20           Mr. Ahmad has a fiancee in Pakistan, and he

21   is looking forward, your Honor, to rebuilding his life

22   and putting this tragic and criminal episode behind him,

23   your Honor.  We'd respectfully ask for a sentence of

24   24 months.

25           THE COURT:  Mr. Gibbs.

1          ATTORNEY GIBBS:  Thank you, Judge.

2          Judge, first of all to address a couple of

3  the points that Mr. Mizer made.  In discussing some of

4  these other cases involving a terrorism offense it's --

5  again, it's our position that it's very difficult to

6  compare these other cases because the facts are so

7  different.  Some of them are guilty pleas, some of them,

8  there was cooperation.  Mr. Mizer pointed to two cases

9  that actually I worked on with Mr. Kromberg here in this

10  courthouse before Judge Brinkema.  He identified them as

11  Numbers 26 and 27 in his pleading.  And that was Yong

12  Kwon and Muhammad Aatique.  Yes, they got significantly

13  lower sentences than this defendant, but a couple of

14  differences.  First of all, they weren't convicted of

15  2339(B) offenses and they had a plea agreement calling

16  for cooperation.  They cooperated, testified, got

17  substantial reductions.  I can't remember the original

18  sentence, but I think it may well have been up to if not

19  beyond 15 years, and given --

20          THE COURT:  Section 5K 1.1 in those.

21          ATTORNEY GIBBS:  Exactly, Judge.  And

22  again --

23          THE COURT:  That is a pretty significant

24  omission, Mr. Mizer.  You should have told me about

25  that.

1          ATTORNEY MIZER:  Your Honor, it's in the

2     papers.  The cooperation with the government, it's in

3     the papers.

4          THE COURT:  Go on.

5          ATTORNEY GIBBS:  And so, Judge, I think -- I

6     think, you know, that is indicative of how difficult it

7     is to try to compare these cases.  There are other cases

8     from other districts that also involve please

9     agreements.  I am not familiar with a lot of those.  I

10    don't know whether there was substantial assistance or

11    not.  What I do know, though, in this case we are not

12    making --

13         THE COURT:  This defendant is cooperating,

14    isn't he?

15         ATTORNEY GIBBS:  Judge, there is a

16    cooperation provision in his plea agreement.  He has met

17    with the government, we proffered him, but as I pointed

18    out in the pleadings, he hasn't done anything to date

19    that would warrant a departure.  So that is where we

20    stand.  We certainly are not closing the door to that

21    going forward; and if the defendant does provide

22    substantial assistance, I would be happy to come back

23    before this court and make the appropriate motion, but

24    we simply are not there at this point.

25         Judge, the other quick point I wanted to

1    make and then I had some final remarks, on the -- the

2    argument about the 2339(B), I don't think it's accurate

3    to say that in every 2339(B) case the sentence is going

4    to be capped at 15 years.  There are going to be 2339(B)

5    cases where for various reasons the terrorism

6    enhancement won't apply.

7           And again that enhancement requires a

8    specific mens rea, intended to influence or affect

9    government conduct language.  There could certainly be

10   2339(B) cases where a defendant provided material

11   support to a foreign terrorist organization but they

12   didn't have that intent.  There could be cases where

13   they just did it for money.  They got paid.  There could

14   be cases where they had a close relationship with

15   someone like a family member a good friend --

16          THE COURT:  I understand that, but that

17   doesn't help me determine an appropriate sentence here

18   under the factors of 3553(B).  I understand that -- how

19   the enhancement applies.  I understand that he

20   stipulated to it; but even if he had stipulated to it,

21   if I didn't think these facts warranted it, I wouldn't

22   accept the stipulation.

23          So I do think the enhancement appropriately

24   applies, and I do understand that there could be some

25   cases in this table where it wasn't applied.  That's

1    your point, isn't it?

2               ATTORNEY GIBBS:  It is, Judge.  That is

3    exactly right.

4               THE COURT:  What else do you have?

5               ATTORNEY GIBBS:  Well, Judge, I think the

6    Court has really hit the core issue for us.  Given that

7    the statutory maximum is 180 months in prison and given

8    that the advisory guideline range is 292 to 365 months

9    in prison --

10              THE COURT:  Let's go back for a minute.  You

11   said some things in your supplemental brief about

12   this -- about this video.  Of course, we can't determine

13   how many people saw it or how many people were

14   influenced by it, or where it now resides, or how it's

15   now used.  I take it you don't know, do you?

16              ATTORNEY GIBBS:  No.  And I think that goes

17   to the troubling point from the government's

18   perspective.  Mr. Mizer made the point about we can't

19   say a single person who --

20              THE COURT:  It was posted on YouTube.

21              ATTORNEY GIBBS:  It was absolutely posted on

22   YouTube.  The case agent was able to access it on at

23   least a couple of an occasions.

24              THE COURT:  So in effect it's almost

25   perpetual.

1          ATTORNEY GIBBS:  That -- that is our

2    argument, Judge, and I think that's right.  Once

3    something gets on the Internet like that it's difficult

4    to believe that there's ever a point where you can say

5    it's disappeared entirely, especially with a group like

6    LeT which has a savvy media program.  And I think it's

7    telling that Talha Saeed, the son of the head of the

8    group, reached out to this defendant to get this

9    propaganda video produced.

10          I think that speaks for itself that his

11   expertise had value to them, and it's difficult to

12   believe they would produce this video, go to that

13   effort, if it wasn't useful to the group.

14          THE COURT:  And you've seen the video, of

15   course.

16          ATTORNEY GIBBS:  I have, Judge.

17          THE COURT:  And it's characterized by what?

18          ATTORNEY GIBBS:  It's about five minutes

19   long.  There is audio on it, which is a prayer by Talha

20   Saeed, who is the head of the group.  It's not in

21   English.  You can hear Mujahideen being spoken

22   throughout.  And we've had it translated.  It's an

23   prayer praising Mujahideen.  And as the video plays it

24   begins with scenes of atrocities.  Dead bodies, very

25   bloody images of what appear to be Muslims who have been

1    killed primarily in the Kashmir area.  There are some

2    images of Indian soldiers.

3           The prayer continues to play, and then the

4    focus of it changes, and it's what I can only describe

5    as sort of the response to those atrocities.  And then

6    see fighters with their faces covered carrying AK 47s.

7    You see fighters carrying RPGs.  Mr. Mizer is correct.

8    You see some missiles and fighter jets.

9           Then you see actual -- it's not still

10   images.  It's actually moving images, what appear to

11   be -- having seen these, it looks very much like IED

12   attacks on vehicles, military vehicles in appears to be

13   Afghanistan.  And there's a number of these.  There is

14   even one where there's an arrow pointing down.  You see

15   a military vehicle move across the screen, and then

16   right where the arrow is it explodes from IED attack.

17          That is pretty much the video.  And again

18   when you watch it it's clear that the beginning of it is

19   to really get people's blood boiling about these

20   atrocities and then to see the response, to see that

21   there is a way to fight back.  And Mr. Mizer made the

22   point we can't point to a single person that we can show

23   was motivated by the video to join LeT.  He is right,

24   but that's the problem.

25          LeT is a foreign terrorist organization.

1    They are not sharing their membership list with us.  But

2    what we do know is they run these training camps.  They

3    run the two that defendant attended.  They run the third

4    paramilitary camp that he also attempted to attend, but

5    he was too young.  But he's told others in e-mail

6    communications and chats that he wants to go finish it,

7    he wants to be launched.

8              And again this is the serious paramilitary

9    training that LeT uses before sending people off to go

10   fight against India, to go fight against the Indian

11   troops.  So I think to characterize it as it's only a

12   five-minute video, that five minutes is plenty long to

13   motivate people to go and join LeT.  And to try to

14   minimize the length of time again --

15             THE COURT:  There are also references to the

16   72, the --

17             ATTORNEY GIBBS:  That's exactly right,

18   Judge.

19             THE COURT:  I guess I've gotten so old now,

20   but I -- it's hard -- of course, terrorism is such a

21   terrible thing.  Many innocents are killed and to hear

22   young people say that they want to be martyred, so they

23   go on and they go to some heaven where they have 72

24   virgins.  That's so bizarre.  I can't imagine what god

25   would give you 72 virgins for killing innocent people.

1          ATTORNEY GIBBS:  And, Judge, I --

2          THE COURT:  Even if one is inclined to

3  belief in God that would not be a very sensible one to

4  believe in.  In any event, that's just my view.  It's

5  pretty clear that he intended to be launched, which

6  meant that he intends to go to the third camp, and he

7  intends to get married, and then he intends to martyr

8  himself.  I think the word is shaheed.  And he intends

9  to have his 72 virgins.

10         If there is a heaven, I hope the reward is

11  something a heck of a lot better than 72 virgins.  What

12  is a ridiculous, absurd reward.

13         Go ahead.

14         ATTORNEY GIBBS:  Judge, I think you've

15  really hit on the central point that is of concern to

16  the government, and that is that here is a defendant who

17  stands before the Court asking for a 24-month sentence.

18  Twenty-four months from today he would be 26 years old.

19  Now, he stipulated to the court deportation.  I think

20  it's likely he will return to Pakistan where his fiance

21  lives, where his family is.

22         But that was the exact same situation when

23  he made that statement about the 72 virgins.  He was

24  hoping, that was his great aspiration in life, was to

25  return, to take innocent life, to be martyred and

```
 1    somehow this belief that he would be rewarded in heaven

 2    for that was what -- was the reward waiting for him in

 3    paradise.

 4                And it is difficult to believe that

 5    24 months in prison, having been convicted of a material

 6    support offense that that mindset can possibly being

 7    changed.

 8                THE COURT:  I have never heard, this is

 9    irrelevant to this sentencing, but there are obviously

10    some female shaheeds because there are women who carry

11    bombs into places.  Maybe not LeT, but other

12    organizations.  What do they get?  72 what?  All of

13    which any thinking person would have to conclude that

14    that was absurd.  But anyway it's irrelevant to this

15    sentencing.

16                What else do you have?  It's demeaning of

17    women anyway.

18                ATTORNEY GIBBS:  I would agree, Judge.

19                THE COURT:  At a minimum.

20                ATTORNEY GIBBS:  Judge, and I did want to

21    briefly mention because you talked about it being

22    demeaning to women, one of the communications that

23    obviously concerned us that was in our pleading involved

24    him speaking with this woman online and telling her --

25    she had asked if girls could do Jihad, and he said,
```

1    "yes, nowadays in Palestine girls could Jihad."  One

2    girl --

3                  THE COURT:  I read that, and that's why I

4    asked what do they get?  72 what?

5                  ATTORNEY GIBBS:  Right.  And if there's an

6    answer to that question, Judge, he didn't in that

7    communication say what it was.  I don't independently

8    know the answer to that.  Obviously, that is concerning.

9    I think it is demeaning to women, to sort of take that

10   approach.

11                 THE COURT:  No society flourishes if they're

12   going to discount the talents and abilities of half of

13   their population, that they are exactly like the talents

14   and the abilities of the other half.  I have done a lot

15   of things in my life, and I have never done anything

16   that a woman, some women couldn't do better if not as

17   well.  Well, I should say as well if not better.  That

18   includes being a fighter pilot and other things I have

19   done in my life.  There are women who could do it far

20   better than I did it.  And there are men who could have

21   done it far better than I did it.

22                 No society flourishes if they're going to

23   retrain one-half of its population.  And anyway, it's

24   evil to do it.

25                 Go ahead.  What else do you have?

1          I am not sitting today in judgment of other

2     societies or religions or anything else.  I am sitting

3     today solely to decide what is the proper or just

4     sentence to impose on this young man for the activities

5     he engaged in under the sentencing factors of 3553.

6     That's what I am sitting on today.  But I make these

7     other remarks in the vain hope that it might strike

8     somebody to think a bit about these things.  And I am

9     thinking about others in this courtroom who may have

10    similar views to this defendant.

11          ATTORNEY GIBBS:  Thank you, Judge.  Just

12    real briefly.  I think the Court is obviously very

13    familiar with the record, which I appreciate.  But the

14    one point I want to make is, Judge, if all this

15    defendant had done was construct this propaganda video

16    for LeT and that was the entirety of his conduct, the

17    advisory guideline range in this case would still be the

18    same.  It would that 292 to 365 months.  And obviously

19    we are capped at the statutory maximum.

20          But as we point out in the sentencing memo

21    that I am sure the Court is familiar with when the

22    defendant produced that video, that was the culmination

23    of years of activity to trying to LeT.  I mean, again --

24          THE COURT:  Many of them as a juvenile.

25          ATTORNEY GIBBS:  Exactly.  Fourteen to

1    15 years old, attending the two first levels of LeT

2    training.  Then he tried to go to the third level and

3    got rejected for being too young.  But, Judge, that

4    didn't deter him.  He told other people online, as I've

5    talked about, that his goal was to go back and finish

6    that and to be launched.  But keep in mind he also acted

7    as a personal recruiter for LeT here from his home in

8    Virginia.

9                THE COURT:  I am familiar with all that.

10               ATTORNEY GIBBS:  And, Judge, so we don't

11   view this similar as a case where, even if it was a

12   video, that that was somehow one slip-up.  This is a

13   case where the defendant --

14               THE COURT:  They haven't argued that it was

15   a slip-up.

16               ATTORNEY GIBBS:  Understood, Judge.  And so

17   here we have an individual who is familiar with LeT,

18   familiar with what this group does, produced this

19   propaganda video.  He is facing well above the statutory

20   maximum under the guidelines, and we believe under the

21   3553(A) factors for all the reasons of the seriousness

22   of the offense, to promote respect for the law, to

23   provide just punishment, and equally importantly for

24   specific and general deterrence --

25               THE COURT:  Well, in these cases that Mr.

1    Mizer has cited, that are listed in this article -- I am

2    not sure why the article was cited other than that, Mr.

3    Mizer.  I think that's your reason -- you are not

4    interested in the trust of the article.  You are

5    interested in the data that he presents; is that right?

6              ATTORNEY MIZER:  Yes, your Honor.  That is

7    correct.

8              THE COURT:  Well, in all that data which

9    case would you say is analogous to this case?

10             ATTORNEY GIBBS:  If I could just have a

11   moment, Judge.  It would obviously have to be a 2339(B)

12   case, and I am familiar with some of these.

13             THE COURT:  It would have to be a 2339(B)

14   case in which the enhancement applied.

15             ATTORNEY GIBBS:  Correct, Judge.

16             THE COURT:  Well, there are any number of

17   these.  For example, look at Number 30.  That was in the

18   Southern District of New York.  He got the statutory

19   maximum of 15 years for traveling to Pakistan and

20   attending the LeT training camp.  Why won't that be the

21   first one you'd cite?

22             ATTORNEY GIBBS:  Judge, and I agree.  I

23   think that's good, and in some respects simply

24   traveling --

25             THE COURT:  Didn't you look at this chart

1    and consider which one you would call to my attention as

2    being the most analogous.

3              ATTORNEY GIBBS:  Well, I think the Brent

4    case, which is the one the Court points out is a good

5    one.  I also think Number 28, the Sadequee case from the

6    Northern District of Georgia.

7              THE COURT:  That is a little different

8    because that included 2339(A)(2) and went to a jury

9    trial and -- well, that is a little different.  What

10   else do you have?

11             ATTORNEY GIBBS:  Well, Judge, really within

12   this -- these cases, that's among the best.  And Number

13   24, the Chandia case, that was actually my case here in

14   this courthouse as well.

15             THE COURT:  Look at the Chandia case?

16             ATTORNEY GIBBS:  Judge Hilton sentenced him

17   to 180 months.  Again, that was on a jury trial, not a

18   plea, but I think that that is another one that is

19   pretty analogous to this one.  And that's also --

20             THE COURT:  That hasn't been resentenced

21   because that case was vacated, and it's going to be

22   resentenced.  So that's not a good one to use, is it?

23             ATTORNEY GIBBS:  Well, actually, the Fourth

24   Circuit just affirmed that last week.

25             THE COURT:  So what did he receive?

1          ATTORNEY GIBBS:  180 months.

2          THE COURT:  All right.  And they affirmed

3     that.

4          ATTORNEY GIBBS:  They did affirm that,

5     Judge.  And that will be a published opinion.

6          THE COURT:  Are you familiar with the recent

7     Ninth Circuit case where a sentence was reversed for

8     being too lenient?

9          ATTORNEY GIBBS:  Judge, I am familiar -- I

10    am familiar with the fact that that occurred.  I am not

11    familiar with all the facts of that case.

12         THE COURT:  All right.  Well, it won't play

13    any role in this sentencing then because you didn't cite

14    it, and Mr. Mizer has not had an opportunity to review

15    it and address it.  So it won't play any role.

16         Do you have anything else?

17         ATTORNEY GIBBS:  No, judge.  No, just again

18    we've argued for the 180 months.  We think it is an

19    appropriate sentence given the conduct and the 3553

20    factors.  And I want to thank you for your time.

21         THE COURT:  Any reason why the Court should

22    not now impose sentence?

23         ATTORNEY MIZER:  No, your Honor.

24         THE COURT:  All right.

25         Come to the podium, Mr. Ahmad.

1          THE DEFENDANT: (Complied).

2          THE COURT:  Mr. Ahmad, you stand convicted

3   of the serious crime of providing material support to a

4   designated terrorist organization, and the law requires

5   that I consider a variety of factors in imposing an

6   appropriate sentence.

7          First, your personal history and

8   characteristics, and I think I am familiar with those

9   through the presentence report and through the factors

10  that your counsel has called to my attention.

11         The law also requires that I take into

12  account the seriousness of the offense, and it is a

13  serious offense.  Congress has explicitly made it and

14  indicated that it is a serious offense.  Terrorist

15  organizations are a cancer on any civil, civilized

16  society because terrorist organizations seek to affect

17  policy and national behavior by killing innocent people.

18  So it's a very serious crime.

19         Your counsel points out that we can't

20  tell -- and he is right, we can't tell how many people

21  your video might have affected, might have recruited,

22  might have influenced.  We can't.  But that doesn't mean

23  that it wasn't seen by people.  The government properly

24  points out that, yes, your video might be seen by lots

25  of people who wouldn't be influenced by it, but it has a

1   target audience, young alienated people in the, chiefly,

2   I would assume, of the persuasion -- they'd have to be

3   Islamic, to be sure, Muslim.

4          That doesn't mean there haven't in history

5   been Christian terrorist organizations, Jewish terrorist

6   organization.  There have been, they are no more

7   laudable or praiseworthy than LeT.  Just as there have

8   been peaceful Christians, peaceful Jews and peaceful

9   Muslims, there have also been terrorists in each of the

10  three.

11         The law requires that I take into account,

12  as I said, the seriousness of this offense.  The law

13  also requires that I -- it's not just the video.  It's

14  also your recruiting efforts.  The law requires that I

15  take into account the need to impose a sentence that

16  promotes respect for the law, that provides just

17  punishment for the offense and that deters you and

18  deters others.

19         Deterring you, I think, is important, but I

20  am not sure that the sentence I impose is going to deter

21  you from engaging in terrorist activities.  But it's

22  important that the sentence I impose on you stand as a

23  beacon, as a warning to all others that providing

24  material support to terrorist organizations is serious

25  and will involve serious punishment.  General deterrence

1   is very important in this sentence.

2             The law also requires that I take into

3   account the guidelines.  They are not mandatory.  They

4   are advisory.  In this case, the bottom of the

5   guidelines -- what was the bottom of the guidelines?

6   Was it 180?

7             ATTORNEY GIBBS:  The guidelines was

8   292 months, Judge.

9             THE COURT:  Right.  So it's really above the

10  maximum.  So the guidelines play no role essentially in

11  this sentencing.  The statutory maximum is 180 months.

12            The law also requires that I take into

13  account the need to protect society from you.  I don't

14  know what you will do with the rest of your life,

15  Mr. Ahmad.  I hope that you will focus on the good

16  things about Islam and to make something of yourself in

17  building a civilized, humane society in Pakistan.  But I

18  don't have any illusions that the sentence I impose on

19  you today will do that.

20            I've taken into account all of these

21  factors.  Ultimately, a sentence is a judgment.  It's

22  not a mathematical calculation.  It's a judgment.

23            I also have to impose a sentence that does

24  not involve unwarranted disparities between the sentence

25  I impose on you, Mr. Ahmad, and the sentence that has

1    been imposed on others for essentially similar conduct;

2    and in that regard I have looked at the data that your

3    counsel has provided and also have -- the data is

4    available, Mr. Mizer, at the sentencing commission.  You

5    can get from the sentencing commission every sentence

6    ever imposed under 2339(B).

7            But they are, as Mr. Gibbs pointed out,

8    difficult to assess the comparability because you have

9    Section 5K 1.1 motions in some, you have other statutes

10   that play in others.  You might not have the terrorist

11   enhancement in others.  So it's difficult to do.

12           In the end it is the judgment of this court

13   that you be committed, Mr. Ahmad, to the Bureau of

14   Prisons, to the custody of the Bureau of Prisons for a

15   period of 144 months.  That's less than the statutory

16   maximum.

17           The 24 months that you have asked for, or

18   time served that you had really asked for, that your

19   counsel has suggested is woefully inadequate to serve

20   the purposes of general deterrence and to account for

21   the seriousness of this crime.  It is clear that

22   24 months would not account for the seriousness of

23   providing material support.

24           I have sentenced others in connection with

25   these violations, and virtually all of the others, I

1    guess I remember one particularly, received twice the

2    sentence that you've received today.  Now, his role was

3    different from yours.  He actually bore arms.  But

4    nonetheless, I think this sentence adequately accounts

5    for all of the 3553 factors.

6            It isn't as severe as the government would

7    seek, but I want to make clear that it is what it is

8    because of the reasons the government has argued, namely

9    general deterrence and seriousness of the crime.  And

10   those principal factors would not be served by a

11   24-month or time served.

12           You will pay $100 special assessment.  Upon

13   release from confinement, you are to serve five years of

14   supervised release.  As a special condition of that

15   supervised release, you are to cooperate fully to affect

16   your prompt removal from this country to your country of

17   origin, to Pakistan.

18           Have I omitted anything?

19           The court does not impose any punitive fine

20   because of your modest resources.

21           Mr. Gibbs, have I omitted anything?

22           ATTORNEY GIBBS:  No, judge.  Thank you.

23           THE COURT:  LeT me ask the probation

24   officer.

25           PROBATION OFFICER:  No, your Honor.

1              THE COURT:  All right.

2              Anything further from the government, then.

3              ATTORNEY GIBBS:  No, judge, thank you.

4              THE COURT:  And you'll receive credit for

5     time already served in connection with this offense as

6     computed by the Bureau of Prisons pursuant to statute.

7              Now, you -- I would be happy to reduce that

8     sentence on the motion of the government for substantial

9     assistance should that occur.

10             I take it that there is no optimism that

11    that might occur.  The defense would say because he does

12    not have information that would be of substantial

13    assistance to the government, and the government would

14    be prepared to offer ways in which he could offer

15    substantial assistance, but that is not the business of

16    this court.  If such a motion is filed, I would be

17    pleased -- I am always pleased to reduce sentences.

18    Always pleased to do that.

19             ATTORNEY GIBBS:  Thank you, sir, and we

20    would certainly be pleased if that were the case as

21    well.  It's difficult to predict at this point.

22             THE COURT:  Anything further, Mr. Mizer?

23             ATTORNEY MIZER:  No, your Honor.

24             THE COURT:  All right.  I thought both of

25    you submitted briefs that were helpful to the Court.

1    Thank you.

2              Good luck, Mr. Ahmad.  I hope that you --

3    you have a long life ahead of you.  Life is making

4    choices and living with the consequence of the choices

5    you make.  You don't determine, Mr. Ahmad, where you are

6    born, to whom you are born or whether you are born with

7    handicaps or talents, but you do determine how you

8    respond to all of those things.

9              You have a long life ahead of you.  You have

10   opportunity to make the most of your life.  Your desire

11   to marry and have children is as understandable and

12   human as it could possibly be.  It's a desire I have

13   had.  Everybody in this courtroom has had that desire.

14   But we didn't get into this, but I think that the role

15   that parents play in the paths their children chose is

16   pretty significant, and I hope you will remember if you

17   do have children, and I hope you will, that you are the

18   model for your children.  And any parent wants to have

19   their children have a fulfilling and happy life.  A life

20   of engaging in terrorism is not that.

21             Anything further?

22             All right.

23             I thank Counsel for your cooperation.

24                        ---

25

CERTIFICATE


1    I, MICHAEL A. RODRIQUEZ, an Official Court
Reporter for the United States District Court, in the
Eastern District of Virginia, Alexandria Division, do
hereby certify that I reported by machine shorthand, in
my official capacity, the proceedings had upon the
sentencing hearing in the case of UNITED STATES OF
AMERICA v. JUBAIR AHMAD.


I further certify that I was authorized and
did report by stenotype the proceedings in said
sentencing hearing, and that the foregoing pages,
numbered 1 to 44, inclusive, constitute the official
transcript of said proceedings as taken from my machine
shorthand notes.


IN WITNESS WHEREOF, I have hereto subscribed
my name this  17th  day of  June         , 2012.



                              /S/
                    Michael A. Rodriquez, RPR/CM/RMR
                       Official Court Reporter